UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RONALD SUITOR,

                Plaintiff,                Case No. 17-cv-11137

v.                                      Honorable Thomas L. Ludington

CHARTER COMMUNICATIONS, LLC,

                Defendant.

_____/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S MOTION IN LIMINE AS MOOT, AND OVERRULING DEFENDANT'S OBJECTIONS TO PRETRIAL DISCLOSURES AS MOOT**

On April 11, 2017, Plaintiff Ronald Suitor filed a complaint against Defendant Charter Communications, LLC. ECF No. 1. Suitor alleges that Charter fired him in retaliation for taking medical leave, thus violating the Family and Medical Leave Act, 29 U.S.C. § 2615. On January 9, 2018, Charter filed a motion for summary judgment. On March 27, 2018, Charter also filed a motion in limine to exclude certain evidence at trial and objections to certain of Suitor's pretrial disclosures. ECF Nos. 16, 17. For the following reasons, Charter's motion for summary judgment will be granted, and Charter's motion in limine will be denied as moot.

**I.**

**A.**

Plaintiff Ronald Suitor was hired by Defendant Charter Communications in July 2014 to work as a direct sales representative in Charter's Bay City branch. Suitor Dep. at 15–17, ECF No. 10. As a direct sales representative, Suitor was provided "address leads" ("houses that either didn't have Charter services or were existing internet-only customer[s]") and was directed to persuade those individuals to purchase Charter's "triple-play" service, which bundles television, internet,

and phone services. *Id.* at 19. Direct sales representatives receive a yearly salary of $19,200.00. Offer Letter at 1, ECF No. 12, Ex. 2. However, sales representatives also receive commission compensation, and commissions typically represent a large majority of yearly compensation for direct sales representatives. When Suitor was originally hired by Charter, he received an offer letter which estimated that his "annual, variable commission target" would result in approximately $54,195.48 in commissions. *Id.*

At Charter, that commission target works in conjunction with monthly sales quotas. Those quotas consisted of two thresholds. The minimum threshold is 10 triple plays per month. Suitor Dep. at 21.[1] The monthly goal is twenty-three triple plays per month. *Id.* If a direct sales representative fails to reach the minimum threshold, they do not receive a paycheck for that month. Brackett Dep. at 5, ECF No. 10.

When a sales representative takes leave, their monthly quotas are reduced pursuant to an undisclosed Charter algorithm. *Id.* at 5–8. Terry Brackett, a supervisor for the Suitor and other sales representatives during the relevant period of time, indicated that the minimum sales threshold would typically drop by two for every five business days the direct sales representative was on leave. *Id.* Thus, if a sales representative takes two weeks of leave, their minimum sales threshold for that month drops to six. *Id.* at 7–8. Because the adjustment to the minimum threshold is

---

[1] The record contains contradictory information regarding the minimum threshold. Several Charter employees, including Suitor, testified that the minimum monthly threshold was ten. *See id.*; Brackett Dep. at 5, ECF No. 10. Charter cites to a June 26, 2015, Performance Improvement Plan which indicated that the "minimum quota" for the next month was "12 Total Sales." June 26, 2015, PIP, ECF No. 10, Ex. 7–4. However, other Charter records refer to the "target threshold" as being ten triple plays. *See* Incident Invest. Rep. at 3, ECF No. 10, Ex. 14 (entry for May 25, 2016). The same incident investigation report contains multiple entries highlighting months where Suitor failed to reach the "mid-month target of 12" sales. *See, e.g., id.* at 1 (entry for November 24, 2015). The disparity in the record can perhaps be reconciled as follows: the minimum threshold for receiving a paycheck was ten triple play sales per month. However, direct sales representatives met with their supervisor halfway through the month to provide an update on their progress towards the overall goal of 23 sales. If the direct sales representative had not made 12 sales (and thus was not on pace to meet the overall goal), the supervisor might prepare a performance improvement plan. Alternatively, perhaps the monthly threshold changed over time. Regardless, the ambiguity in the record is not material to the dispositive issues.

calculated pursuant to an algorithm, Charter management is not involved in any modifications based on leave. *Id.* at 8.

Supervisors like Terry Brackett also receive commission bonuses based on the number of sales made by the employees they supervise. *Id.* at 11–12. Mr. Brackett indicated in his deposition that the threshold for his bonus was not reduced when his employees took leave. *Id.* Thus, if a sales representative takes leave, their supervisor is less likely to receive a commission bonus. *Id.*

**B.**

During his time with Charter, Suitor experienced certain recurring challenges in his personal life. Suitor requested leave several times in response to those challenges.

**1.**

October 26, 2015, Suitor sent Shaun Harton (his then-supervisor) an email regarding a possible leave of absence. Oct. 26, 2015, Email, ECF No. 10, Ex. 7. Suitor indicated his "desire for a leave of absence for about 3 months of winter." *Id.* He explained that his wife suffered from a variety of medical conditions and that wintering in Florida was "an effective and proven successful therapy." *Id.* In his deposition, Suitor provided further detail. Suitor Dep. at 87. Suitor's wife experiences several "[p]hysical and mental disabilities" and, during the time in question, was providing primary caregiving to Suitor's aging father. *Id.* at 8, 87. In mid-November of 2015, Suitor's wife had "pretty much . . . wore out" and told Suitor that she would "leave if [he] didn't do something to relieve her." *Id.* at 87. In response, Suitor submitted a formal leave request. *Id.*

After Suitor submitted the request, there was communication between Mr. Horton, Scott Zybtowski (Mr. Horton's supervisor), Mariaelena Cavazos (a human resources representative), and Suitor. *See* Nov. 10, 2015, Email Chain, ECF No. 12, Ex. 4. Suitor reiterated that he needed ninety days of leave to address his wife's "documented medical issues and mental health issues

that require[d] her to a [sic] warmer climate in the winter months." Nov. 10, 2015, Email Chain at 1. Initially, Suitor requested personal, non-medical leave. *Id.* at 2–3. The leave request form Suitor submitted included a space requesting FMLA leave, but Suitor indicated that he intentionally decided against requesting FMLA leave because his wife was uncomfortable disclosing the nature of her medical issues. *Id.* at 1. Ms. Cavazos asked whether Suitor was "possibly requesting FMLA" and informed Suitor that Charter "seldom authorize[s]" personal leaves of absence and that such leaves are limited to thirty days. Nov. 10, 2015, Email Chain at 1–2. In response, Suitor indicated that he would speak to his wife about the leave policy and consider requesting FMLA leave. *Id.* at 1.

On December 10 and 11, 2015, Suitor submitted two additional leave requests. In the first leave request, submitted on December 10, Suitor sought personal, non-medical leave from January 11, 2016, to February 9, 2016. *See* Dec. 10, 2015, Leave Request at 1, ECF No. 12, Ex. 6. In the December 11, 2015, leave request, Suitor sought FMLA leave from January 11, 2016, to March 21, 2016. *See* Dec. 11, 2016, Leave Request, ECF No. 12, Ex. 9. One of the reasons that Suitor was seeking FMLA leave was because his father was scheduled for cancer-related surgery on January 11, 2016. Suitor Dep. at 96–97.

It is less than clear why Suitor requested both personal leave and FMLA leave. The topic was discussed at his deposition:

> Q All right. But for the one in November and the one in December you didn't ask for FMLA leave; you asked for personal leave?
>
> A Well, I already had an FMLA leave in process.
>
> Q So if you already had an FMLA in process, why did you request a personal leave?
>
> A I didn't know – I thought it was going to take some time for my wife – because I had two people that were ill that were going to get medical certifications –

*Id.* at 92.

It seems that Suitor believed that his request for FMLA leave would take more time to process (since he needed medical documentation),[2] and so he thought he "would have a 30-day leave and then an FMLA." *Id.* at 95. When asked why the both leave requests covered January 11, 2016, through February 9, 2016, Suitor indicated that he might have made a clerical error. *Id.* at 97.

In response to the leave requests, Mr. Zybtowski and Ms. Cavazos scheduled a meeting with Suitor. Suitor Dep. at 90–91. Suitor believes that Mr. Zybtowski "crossed some boundaries" during the meeting. *Id.* at 101. In particular, Suitor was troubled by Mr. Zybtowski's questions about Suitor's personal issues with his wife. *Id.* Mr. Zybtowksi recommended that Suitor call a Charter helpline. *Id.* at 103–04. According to Suitor, Mr. Zybtowksi also told Suitor that he was "a marginal employee and [needed] to resign." *Id.* at 104. In his deposition, Suitor characterized the conversation as follows:

> And Scott indicated again, well – he said, "You're marginal at best." "This is affecting my bottom-line," is what he said. "I'll have to carry you on the roster." Well, that tells me this is money moti –that's his focus, and I understand he's got a department to run, but, you know, we're not here about that. We're here to discuss my leave, and this – he said exactly, "You're a marginal employee at best. This is affecting my bottom-line," that, "I'll have to carry you on the roster," and, "You need to resign."

*Id.* at 105. *See also id.* at 107 ("[H]e asked for my resignation on – two times during that meeting").

Suitor's discussions with Ms. Cavazos during the meeting were less confrontational. Suitor and Ms. Cavazos discussed other Charter employees who had received FMLA leave, and Ms. Cavazos suggested that Suitor might be eligible. *Id.* at 102, 106.

Suitor's request for personal, non-medical leave was denied, but his request for FMLA leave was granted. *See* Notations to Req. Leave Absence, ECF No. 12, Ex. 6; Designation Notice,

---

[2] This documentation was provided to Charter between December 18 and 23, 2015. Suitor Dep. at 109.

ECF No. 12, Ex. 11. Both of Suitor's leave requests specified the requested start date as January 11, 2016. However, Suitor was scheduled to take vacation from December 23, 2015, to January 4, 2016. Suitor Dep. at 110. Suitor also had four floating holidays available, and he wished to use those holidays to cover the week between his vacation and the beginning of his FMLA leave. *Id.* at 111–12. Mr. Harton refused to allow Suitor to use those floating vacation days, and instructed Suitor to contact Ms. Cavazos if he had questions. *Id.* at 112. When Suitor contacted Ms. Cavazos, she suggested that his FMLA leave begin on January 5, 2016. *Id.* at 113. Suitor accepted that proposal. *Id.* at 113–14.

**2.**

Suitor contends that Charter employees retaliated against him for taking FMLA leave in several ways. First, he indicates that he received a warning in January 2016, for failing to meet his sales thresholds for the preceding sales month. *See* Suitor Dep. at 115. The sales cycle in question ran from December 22, 2015, to January 21, 2016. Between Suitor's vacation days and FMLA leave, he only worked December 22 and 23 of that sales period. *Id.* In those two days, he sold five triple plays (with one more sale pending). *See* 1/7/16 Incident Log, ECF No. 12, Ex. 12. *See also* Suitor Dep. at 115. Despite the fact that Suitor was on pace to easily surpass his monthly thresholds (if he had worked the entire month), Mr. Horton faulted Suitor for failing to meet the overall monthly threshold.[3] Mr. Horton forwarded the incident log to Suitor, which included an action plan for Suitor to meet his monthly threshold.

Based in part upon that email, Suitor believed that Charter expected him to work during his FMLA leave. In his deposition, he was asked whether he believed that Mr. Horton's "message

---

[3] Despite the existence of the incident log, there is no evidence that the sales totals for this month were considered by Charter in any employment decisions. The investigation report which summarized Suitor's history with Charter did not identify December 2015 as one of the months where Suitor did not meet his sales thresholds.

was a communication to you that you had to work while on FMLA leave?" *Id.* at 121. Suitor indicated: "That's exactly that, yes." *Id.* Suitor was troubled by the email, and so he contacted his brother, Don Suitor, who also worked for Charter:

> I said, "Don, they want me to work while on FMLA." You know – I said, "I don't know how I'm going to perform all these sales and that," and I said, "They didn't take my tablet and my phone. Will you contact Shaun and –" "Don will you pick up my tablet and phone and go bring it into Shaun and see if he will take it?" . . . So Don did go out . . . and contacted Shaun, and he called me back, and he said, "No, Shaun said you're going to need – "No, he's going to need that for making sales and calling customers," and that told me, well, I guess Shaun's expecting me to keep working."

*Id.* at 123–24.

Accordingly, Suitor made a number of phone calls to prospective customers while on FMLA leave. *Id.*

Finally, after Suitor returned to work, he received a written warning for failing to meet his sales thresholds in May 2016. Suitor believes that he should have merely received a verbal warning because, prior to taking FMLA leave, he had met his sales targets for three successive months. Suitor Dep. at 135. In his deposition, Suitor explained that when a direct sales representative reaches their sales thresholds for three consecutive months, their "step penalty is rolled back." *Id.* In other words, discipline related to failure to meet sales thresholds is less severe for salespeople who have met those thresholds for the three immediately consecutive months. *Id.* at 135–36. Suitor further indicated that, when a salesperson takes vacation, that time counts toward the "rollback." *Id.* at 136. Thus, if a salesperson takes "three months' worth of vacation," he or she "get a rollback." *Id.* When Suitor did not reach his sales threshold in May 2016, he received a written warning instead of the verbal warning he would have otherwise received.

**3.**

Suitor returned from his FMLA leave on March 22, 2016. On April 12, 2016, Suitor sent Ms. Cavazos an email broaching the topic of additional FMLA leave: "Can you kindly advise how many days are remaining banked on my FMLA? I was informed my elderly father I provide care for will have to undergo a couple more surgeries coming up and I would like to plan ahead accordingly." *See* April 12, 2016 at 2, Email, ECF No. 10, Ex. 12. Ms. Cavazos responded (and carbon copied Mr. Brackett, Suitor's new supervisor): "You used 78 days from 1/6/2016 until your return date on 3/22/16. That leaves you with 6 days or 48 hours that you may use until January 4, 2017. On January 4, 2017, you will be eligible for more FMLA days." *Id.*

In late June of 2016, Suitor asked his supervisor, Mr. Brackett, about the possibility of taking FMLA leave. Brackett Dep. at 13–14. Mr. Brackett referred Suitor to Ms. Cavazos, who told Suitor that he had exhausted his FMLA leave. *Id.* In response, Suitor forwarded Ms. Cavazos prior email (wherein she told Suitor that he had six days of FMLA leave remaining) back to her. April 12, 2016 at 2. Ms. Cavazos informed Suitor that her prior calculation had included a thirty day personal leave of absence.[4] *Id.* at 1. However, she told Suitor: "I know how difficult it can be with elderly parents and if you have vacation time, you may use that." *Id.*[5] Approximately five weeks later, Suitor was terminated.

## C.

Suitor attributes his termination (and his periodic struggles to meet monthly sales thresholds) to the personal difficulties he was experiencing and the FMLA leave which he took as a result. Charter identifies another reason for Suitor's termination.

---

[4] As discussed above, Suitor did request a thirty-day personal leave of absence in December 2015, but that request was denied. All parties agree that Ms. Cavazos miscalculated Suitor's remaining FMLA leave. *See* Def. Mot. Summ. J. at 10; Pl. Resp. Br. at 11.

[5] Suitor had vacation time, but opted to spend that time with his (also ailing) wife, rather than his father. Suitor Dep. at 161–162.

**1.**

Suitor's personnel file reflects several entries of note, including two investigations by Charter into reported ethical violations. The first ethical investigation stemmed from events that occurred on November 19, 2014 (several months after Suitor was hired by Charter). Nov. 24, 2014, Incident Rep., ECF No. 1, Ex. 6. On that evening, Ronald Suitor and his nephew, Adam Suitor, were working in the same neighborhood. *Id.* at 2. Adam Suitor was a Charter direct sales representative from the Saginaw, Michigan, branch.

Ronald Suitor described the events of that evening as follows. He had "doubled up" with Adam Suitor because sales representatives were encouraged to do so periodically and because they were canvassing a rough neighborhood. Suitor Dep. at 50. The pair were trying to quickly finish because it was dark. Adam Suitor knocked on several of Ronald Suitor's houses in an attempt to speed things along. *Id.* at 52. At one of those houses, Adam convinced a customer to sign up for a triple play. *Id.* Adam informed Ronald of the potential sale, but Ronald was engaged with a customer of his own. *Id.* For that reason, Ronald logged into the Charter system with his own information and allowed Adam to complete the deal on his behalf. *Id.* According to Ronald, this procedure was "a common practice [known by] the supervisors." *Id.* at 53.

After Adam finished "running" the deal, Ronald reviewed the information and his notes. *Id.* Ronald determined that he had previously signed someone up at the same address earlier in the month. Signing up the same household twice in a month was a violation of Charter polices. *Id.* at 61. As Ronald Suitor explained in his deposition:

> Charter's concern would be there were some people – some [Direct Sales Representatives] that were purposely doing this. Like, they would run somebody, they would get declined, and then they were going and running them again on a purposeful – to be able to earn commission. . . . [A]nd some people got terminated.

*Id.* at 53.[6]

Upon realizing the problem, Ronald Suitor immediately notified his supervisor (at the time, Ryan Wolverton). *Id.* Suitor testified at his deposition that this was the only time he ever ran the same house twice. *Id.* He further insisted that "[t]here was no intent to do anything wrong, defraud or whatever." *Id.* at 55. Nevertheless, Charter took the violation of its policies seriously.

The incident report prepared by Charter corroborates much of Suitor's testimony. Upon being informed of the incident, Mr. Wolverton told Suitor that "rerunning the same address and using a different name at the same address violated the Prepayment Policy." Nov. 24, 2014, Incident Rep. at 2. Mr. Wolverton also reminded Suitor that "another Direct Sales Representative cannot create and run a sales order using a Sales ID that does not belong to them." *Id.* The next day, Mr. Wolverton discussed the issue with several Charter supervisors. The incident report summarized Charter's findings as follows:

> Ronald Suitor violated Charter's Business Ethics and Integrity Policy and Charter's Acceptable Use of Technology Policy when he allowed Adam Suitor to make a sale for him and allowed him to use his Network login, password, and Sales ID's to make this transaction. Ronald Suitor completed the Information Security and Privacy training as a new hire and is responsible for knowing that Charter Policy prohibits anyone else use [sic] of their username or password to log onto the Network or any application. . . . [A] Written Warning is recommended.

*Id.* at 5.

Suitor does not contest the underlying facts or dispute that Charter gave him a written warning. He simply asserts that Charter supervisors openly tolerated the practice of having another direct sales representative complete sales under another sales representative's login information.

---

[6] The original sale was declined because someone at the address had an existing debt to Charter. Nov. 24, 2014, Incident Rep. at 3. When an individual has an outstanding obligation, Charter policies require them to pay their debt *and* prepay the first month's fee for the triple play service before signing up for services again. Suitor Dep. at 29, 61. If a direct sales representative convinces another person in the household sign up for the service, the system does not necessarily identify the outstanding debt. *See id.* at 69–72. For obvious reasons, Charter policies prohibit this end-run around the prepayment requirements.

Suitor Dep. at 52. He likewise emphasizes that there was no intention to circumvent Charter's prepayment policies. He contends that, if he were trying to obtain an illegitimate commission, he would not have immediately and voluntarily reported the improper sale.

## 2.

The second ethical investigation occurred in July of 2016. *See* July 29, 2016, Incident Rep., ECF No. 10, Ex. 14. The investigation was spurred by a customer interaction at the Saginaw, Michigan, Charter store. The incident report indicates that, on July 26, 2016, a couple entered the store and asked to speak with the Charter supervisor, Katrina Findley. *Id.* at 4. The customers indicated that "Ronald Suitor told them they wouldn't have to pay their bill; to let it get disconnected; and that they would get new customer rates if they signed up with a fictitious name." *Id.* According to the customers, "Ronald Suitor wrote up the service agreement with [a fake] name on it and scheduled the install." *Id.* When the customers searched the fake name "in Facebook," they could not find anyone with that name. *Id.* The customers asserted that "Ronald Suitor told them not to come to the local store and to only pay by money order." *Id.*

According to Supervisor Findley, a similar incident had also recently occurred. Ms. Findley reported that "a young customer came into the store" and attempted to make a payment, but was unable to do so because his name was not on the account. *Id.* at 4–5. "The customer told the store staff that the name of the person on that account does not exist." *Id.* at 5.

Ms. Findley sent an email to the Bay City Charter store supervisor to advise him of the two incidents. In response, Terry Brackett informed his supervisor, Scott Zybtowski. Mr. Zybtowski directed Mr. Brackett to "audit the last three months of Ronald J. Suitor's sales including cancels and installs." *Id.*

### i.

The next day, Mr. Brackett began his audit. He discovered several anomalous accounts. Mr. Brackett "noticed . . . a sale made on 7/26/2016 by Ronald J. Suitor" where "the original customer . . . was signed up with the name of [redacted] and without an apartment number." *Id.* When Mr. Brackett called the phone number listed, he received "a message that this was a wrong number." *Id.* Mr. Brackett also noticed anomalies related to a sale Suitor made on April 26, 2016. When the service technician arrived at the address to install the services, "the customer claimed they did not order Charter services [and] that the order had a name on the account . . . that was not his name." *Id.* When Mr. Brackett attempted to call the customer, he did not receive an answer and determined that the number listed by Suitor "appears to be a wrong number on the account." *Id.*

Further investigation revealed a pattern. Mr. Brackett determined that a customer whom Suitor sold to on April 22, 2016, called Charter on May 5 to correct the order. Charter records indicated that the customer stated that "Ronald Suitor put the order at her address under a made up name and that she didn't want the service that way. The order was cancelled and her sister put the service in her name." *Id.* Mr. Brackett called the customer in question, who corroborated Charter's records. *Id.* She indicated that she was not home when Suitor arrived, but that Suitor sold the triple play to the customer's sister. *Id.* Even though the customer was not home at the time, Suitor put the order in her name (not the sister's name) but with an incorrect last name. *Id.* Similarly, a customer Suitor sold to on May 23, 2016, called several weeks later to request a name change. *Id.* The customer indicated that her name had been misspelled on the account. *Id.*

Mr. Brackett also contacted several customers whom Suitor had sold to in the last few weeks, but who had not reported any problems. When Mr. Brackett asked one such customer to verify the correct spelling of her last name, the customer indicated that Suitor had signed her up with an incorrect last name (using, instead, the name of the street on which she lived). *Id.* Mr.

Brackett also discovered that another customer whom Suitor had recently sold to had been signed up with an incorrect last name. *Id.* at 6.

<div align="center">

**ii.**

</div>

After informing Mr. Zybtowski of the results of his audit, Mr. Brackett scheduled Suitor for a meeting on July 29, 2016. At the meeting, Mr. Brackett and Mr. Zybtowski confronted Suitor regarding the apparent pattern of using false names to sign up customers. *Id.* Suitor denied any fraudulent intent. *Id.* Rather, he stated that "he could only go off the information that the customer gave him." *Id.* When he was asked whether he checked a customer's identification before running a sale (as Charter policy required), Suitor "stated he generally did check ID's but not every person." *Id.* And Suitor further admitted that he did not check identification for the customer whose original complaint triggered the investigation. *Id.* When Suitor was asked why he did not check identification for that customer, Suitor stated that "he signed the order up but had notes written down to go back and check identification." *Id.* The order was canceled (by Ms. Findley) before Suitor did so. *Id.* at 5–6. "Scott Zybtowski asked Ronald Suitor why a customer would say that they were told by him not to go into the store and that they were to pay with a money order. Ronald Suitor stated he was advising the customer of different payment methods and that customer's [sic] could pay at the store or online." *Id*. at 6.

According to the incident report, the meeting concluded with a conversation on the following topics.

> Ronald Suitor stated that he tried to write good deals and if the customer lied to him that's on them. Scott Zybtowski stated that controls are in place so these things don't happen and if Ronald Suitor was not following the process of checking identification then when a deal falls through, the Direct Sales Representative is responsible. Ronald Suitor stated if they don't have identification he generally tries to get other forms of identification. Scott Zybtowski stated that there was a pattern to these customer interactions, including misspelled names; different last name; and incorrect phone numbers that didn't belong to the customer signed up. . . . Ronald

Suitor stated that he verified identification, as a rule, and that he did make typos, yet it happens and that his background was spotless. . . . Scott Zybtowski stated that until further investigation, and audits completed [sic], he was going to be placed on a paid suspension.

*Id.* at 7.

### iii.

After the meeting, Mr. Brackett called several customers, including the customer who originally informed Ms. Findley about the situation. According to the incident report, that customer described her interaction with Suitor as follows:

[S]he told Ronald Suitor 2 to 3 times that she already had Charter Services. . . . Ronald Suitor continued to try to sell her and sat down on her porch. Ronald Suitor told her that he could lock her in for 3 years with a price lock. . . . [S]he stated she already had Charter Service. . . . Ronald Suitor told her that if she cancelled her current services and signed up with a name that didn't exist, . . . she could get the new promotions and she didn't need to provide identification. . . . [S]he didn't feel right about this but felt pressured by Ronald Suitor. . . and finally caved.

*Id.*

Mr. Brackett also talked with another customer. That customer described her interaction with Suitor as follows:

Ronald Suitor knocked on her door and said he was selling Charter packages. . . [She] told Ronald Suitor that she owed Charter money because she left her equipment at her previous home and the landlord threw it out. . . . Ronald Suitor offered to sign her up and to put the order in under a random name or he could put her sister's name and use a different last name. [The customer] did not agree to this. . . . Ronald Suitor continued to state he could get her signed up. [She] finally caved and let him sign her up. . . . Ronald Suitor signed her up under [redacted] which was not the correct last name; and was not the name that was given to Ronald Suitor. On Thursday, 5/5/16 [she] called into cancel the order and stated that it was because the order was place [sic] with an incorrect name by Ronald Suitor.

*Id.* at 8.

The incident report concluded with the following summary and recommendation:

Ronald J Suitor was issued a written warning for violating Charter's ethics standards on November 2014; was issued a Verbal Warning with PIP for failing to meet June 2015's sales goals; was issued a Verbal Warning with PIP for failing to

meet July 2015's sales goals; was issued a written warning with PIP for failing to meet Sept 2015's and May 2016's sales goals. Ronald Suitor failed to meet Charter's Business Ethics and Integrity Standards when he knowingly signed up customers by falsifying information to make sure they qualified for services for which they were not entitled for personal gain and at Charter Communication's expense, and because this is his second Business Ethics and Integrity violation, a termination is requested.

*Id.* at 9.

In his deposition, Scott Zybtowski explained that employees who commit two ethical violations are typically terminated. Zybtowksi Dep. at 25–26, ECF No. 10 ("Being that it was the second ethical violation, we submitted it as a termination. . . . With it being an ethical issue, it would have went to a termination."). According to Mr. Zybtowski, Terry Brackett prepared the termination paperwork and submitted it to a local Charter Human Resources representative. After approval by the local human resources representative, Mr. Zybtowksi received and approved the termination request. He forwarded the paperwork to his supervisor, who approved it and then forwarded it to Charter's corporate human resources for processing. *Id.* at 25. *See also* Termination Email Chain, ECF No. 10, Ex. 15.

### iv.

Suitor's description of the meeting in question is largely consistent with the summary provided in the incident report. In his deposition, Suitor indicated that the meeting began with Scott Zybtowski accusing Suitor of forging a customer's signature. Suitor Dep. at 171. Suitor denied the allegation. *Id.*[7] The questioning then turned to Suitor's sale to the customer who originally complained. According to Suitor, that customer "never indicated to me that there was any Charter in this house, and she ordered Charter triple play." *Id.* at 173. Suitor contends that he

---

[7] At his deposition, Mr. Zybtowski admitted that he asked Suitor whether he had forged the customer's signature on a work order. Zybtowski Dep. at 21. Suitor denied the allegation. *Id.* The incident report focuses on the pattern of incorrect names on sales orders, not on the allegation of forgery, so it appears that the termination recommendation was not based on alleged forgery.

"did ask her" for identification, but the customer was unable to find her identification. *Id.* at 173–74. At that point, Suitor had already processed the transaction, and direct sales representatives are unable to cancel transactions once entered. *Id.* at 174. Suitor told the lady that he would come back to check identification. *Id.* at 174. When he attempted to do so the next day, no one answered the door. *Id.* And before he could return, the order was cancelled. *Id.*

In his deposition, Suitor also indicated that Mr. Zybtowski told him during the meeting that, if he had falsified customer order forms, he could be subject to criminal liability. *Id.* at 175. In response, Suitor asked if he should retain a lawyer. *Id.* at 184.

**3.**

As the July 29, 2016, incident report indicates, Suitor also received a number of warnings for failing to meet monthly sales thresholds during his time with Charter. Suitor was hired on July 21, 2014. July 29, 2016, Incident Rep. at 1. In September 2014, Suitor was coached after selling only four triple plays in August 2014. *Id.* For the better part of a year after that coaching, Suitor met his sales thresholds. In mid-May 2015, Suitor was coached "for failing to meet the May 2015 mid-month target of 12." *Id.* Despite the coaching, Suitor sold only twelve triple plays in May 2015. *Id.* While discussing the month with his supervisor, Suitor indicated that a number of potential customers had changed their minds after the sale was written. *Id.* In June 2015, Suitor only sold one triple play, and received a verbal warning and a performance improvement program. *Id.* at 2. Suitor told his supervisor that he had lost focus that month because of personal problems he was experiencing. *Id.* In July 2015, Suitor sold only four triple plays and again received a verbal warning. *Id.* Suitor met his sales thresholds in August 2015, but sold only four triple plays in September 2015. *Id.* He received a written warning and another performance improvement program. *Id.*

As discussed below, Suitor took three months of FMLA leave from January of 2016 to March 2016. Suitor met his sales thresholds in April 2016. At Suitor's mid-May 2016 performance review, however, he had sold only two triple plays. *Id.* at 3. Suitor and his supervisor discussed the fact that the low numbers were due to a high number of cancelled sales. Several days later, Suitor's supervisor advised Suitor that he was still seeing a large number of Suitor's sales being canceled. *Id.* On May 17, 2016, "Terry Brackett and Ronald Suitor had a face-to-face meeting about the large number of cancels." *Id.* Mr. Brackett told Suitor to "make sure the customers were on board with the sale." *Id.* He also cautioned Suitor "not to use the sales order forms unless they were sales that the customer agreed to." *Id.* Despite the coaching, Suitor sold only nine triple plays in May 2016. Suitor received a written warning with a performance improvement program. *Id.*

Suitor received no written or verbal warnings in June or July 2016, which suggests that his sales were on pace to satisfy the thresholds. On August 5, 2016, Suitor was terminated. Suitor Dep. at 188. He contends that he was terminated in retaliation for taking FMLA leave. *Id.* at 190.

## II.

Defendant has moved for summary judgment. A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and

determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

## III.

Suitor's complaint alleges that Charter retaliated against him for taking FMLA leave. The FMLA entitles employees to an annual total of twelve workweeks of leave for a number of reasons including "[i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). The FMLA makes it unlawful for any employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the Act]," 29 U.S.C. § 2615(a)(1), or to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the Act]." *Id*. at § 2615(a)(2).

The Sixth Circuit recognizes two discrete theories of recovery under the FMLA: (1) the "interference" theory arising under § 2615(a)(1), and (2) the "retaliation" theory arising from § 2615(a)(2). *Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012). The main distinction between the two theories is the employer's intent. The interference theory has its roots in the FMLA's creation of substantive rights, and "[i]f an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred," regardless of the intent of the employer. *Id*. (quoting *Arban v. West Pub. Co*., 345 F.3d 390, 401 (6th Cir. 2003)). In contrast, the central issue raised by the retaliation theory is "whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." *Id*. (quoting *Edgar v. JAC Prods., Inc*., 443 F.3d 501, 508 (6th Cir. 2006)). In other words, an employer's intent is relevant only in retaliation claims because those

claims "impose liability on employers that act against employees specifically because those employees invoked their FMLA rights." *Id*. (citing *Edgar*, 443 F.3d at 508) (emphasis original).

As indicated above, Suitor did not plead an interference claim in his complaint. And in his response brief opposing summary judgment, Suitor emphasizes that he is asserting only a retaliation claim. *See* Pl. Resp. Br. at 13 (providing legal citations and authority which govern retaliation claims); *id.* at 22–23 (arguing that "Defendant has a pattern of violating the FMLA" and citing several examples of conduct which might buttress an interference claim, but arguing that "Defendant's serial violations of Plaintiff's FMLA rights further raise a question of Defendant's motivation"); *id.* at 23 ("Defendant's attempts to dissuade Plaintiff from exercising his FMLA rights and to resign his employment, Defendant's punishing Plaintiff when exercising his FMLA rights, and Defendant's denying Plaintiff from further exercising his FMLA rights form a pattern that leads to an inference that Defendant *retaliated* against Plaintiff for exercising his FMLA rights.") (emphasis added). Accordingly, the sole question before the Court is whether Charter retaliated against Suitor for taking FMLA leave.

In its motion for summary judgment, Charter argues, first, that Suitor has not established a prima facie case of FMLA retaliation. Second, Charter argues that, even if Suitor has established a prima facie case, Plaintiff's suit must be dismissed because Suitor was terminated for a legitimate non-retaliatory reason (specifically, signing up customers under fictitious names).

## A.

To establish a prima facie case of FMLA retaliation through circumstantial evidence,[8] the familiar *McDonnell Douglas* burden-shifting framework is applied. 411 U.S. 792. Under that framework, the plaintiff bears the initial burden of establishing a prima facie case of retaliation by

---

[8] Charter argues, and Suitor does not contest, that his retaliation claim relies upon circumstantial evidence of intent.

showing: (1) he was engaged in a statutorily protected activity; (2) the defendant knew that he was exercising his FMLA rights; (3) he suffered an adverse employment action; and (4) a causal connection existed between the protected FMLA activity and the adverse employment action. *Donald v. Sybra, Inc.,* 667 F.3d 757, 761 (6th Cir.2012). The primary focus of FMLA retaliation claims is "the motive of the employer." *Id.* at 512. That is, the question is whether "the action was taken *because* the employee exercised, or complained about the denial of, FMLA-protected rights." *Id.* (emphasis in original).

Charter argues that Suitor has not established the fourth element of a prima facie case: a causal connection between a protected activity and the adverse employment action. The parties primarily dispute whether the temporal proximity between Suitor's protected activity and his termination is sufficient to establish a genuine issue of fact regarding causation.

Cases in this circuit have expressed inconsistent statements regarding whether "temporal proximity, standing alone" is sufficient to establish a causal connection for a retaliation claim. *See Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007) ("[T]emporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim."); *Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006) ("Temporal proximity can establish a causal connection between the protected activity and the unlawful employment action in the retaliation context."). In *Mickey v. Zeidler Tool & Die Co.*, the Sixth Circuit assured district courts that "the two lines of cases are fully reconcilable":

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

516 F.3d 516, 525 (6th Cir. 2008)

In *Mickey*, the Sixth Circuit held that the fourth element of the prima facie case was satisfied because the employee was terminated on the same day that the employer learned of the employee's protected activity. *Id.*

There is, of course, no bright line test for determining what temporal proximity is sufficiently close to satisfy the causation prong of the prima facie case. However, the Sixth Circuit has found that termination three months after returning from leave was "sufficient evidence of a causal connection between the two." *Clark v. Walgreen Co.*, 424 F. App'x 467, 473 (6th Cir. 2011). *See also Parnell v. West*, 114 F.3d 1188 (6th Cir. 1997) ("A time lag of seven months does not necessarily support an inference of a causal link; previous cases that have permitted a prima facie case to be made based on the proximity of time have all been short periods of time, usually less than six months.") (and collecting cases).

In this case, Suitor returned from FMLA leave on March 22, 2016. On April 12, 2016, Suitor initiated discussions about possibly taking additional FMLA leave during the summer. Suitor returned to that discussion in late June of 2016. And, although he was (incorrectly) told he had no FMLA time left, the email exchange clearly indicates that Suitor would have requested FMLA leave if possible. Suitor was placed on paid suspension on July 29, 2016, and terminated on August 5, 2016. Accordingly, Suitor was terminated approximately four and one-half months after returning from FMLA leave and approximately a month and one-half after unsuccessfully seeking additional FMLA leave.

As Suitor argues, both asking for and taking FMLA leave are protected activities. *See Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014) ("By asking Ensign for FMLA leave, Demyanovich both engaged in protected activity and made his employer

aware of it."). "A plaintiff's burden in establishing a prima facie case is not intended to be an onerous one." *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001). Accordingly, and because the temporal nexus between the protected activity and termination falls well within the six month rule-of-thumb identified in *Parnell*, Suitor has identified sufficient evidence of a causal connection between his taking and requesting leave and his termination to establish the fourth element of the prima facie case. And, for good measure, there is other evidence in the record which would permit a reasonable jury to draw an inference of a causal connection. Charter supervisors possessed a financial incentive to discourage leave because it impacted their commission bonuses. And Suitor contends that he was told by Mr. Zybtowksi, who contributed to the decision to terminate Suitor, that Suitor was "a marginal employee and [needed] to resign" during a meeting discussing his leave requests. Suitor Dep. at 104.

Given the evidence which would permit a reasonable jury to draw an inference of a causal connection and Defendant's decision to challenge only the fourth element of the prima facie case, Suitor has met his burden of establishing a prima facie case of retaliation.

**B.**

Once a plaintiff establishes a prima facie case the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *See Donald v. Sybra, Inc.,* 667 F.3d 757, 762 (6th Cir. 2012). To do so, the employer must "prove it had a legitimate reason unrelated to the exercise of FMLA rights for terminating the employee." *Id.* Charter contends that it fired Suitor because of direct customer complaints and Charter's resulting investigation which revealed that Suitor had repeatedly violated Charter ethical policies. If true, Charter's decision to fire Suitor was based on a legitimate, non-discriminatory reason.

At this stage, the question becomes whether Charter's proffered reason is in fact a pretext for discrimination. At the pretext stage, the plaintiff bears the burden of showing "that the employer's explanation was fabricated to conceal an illegal motive." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). A "plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Id.* In other words, "plaintiff must produce sufficient evidence from which the jury could 'reasonably reject [the defendant's] explanation" and infer that the defendants 'intentionally discriminated' against him." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001) (quoting *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 246–47 (6th Cir. 1997)). "[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001).

The plaintiff may discredit the employer's allegedly honest belief, but the plaintiff "must do more than just disagree with a fact that led to her [or his] termination." *Hartman v. Dow Chem. Co.*, 657 F. App'x 448, 453 (6th Cir. 2016). "Instead, [the plaintiff] must focus on the investigatory process and the resulting decision." *Id.* In particular, the plaintiff must make "a specific showing that the employer's decision-making process was not 'reasonably informed and considered' and is thus not worthy of belief." *Id.* (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). Importantly, the employer's decisional process does not need to "be optimal" nor must the employer leave "no stone unturned." *Chrysler*, 155 F.3d at 807. "If there is no material dispute that the employer made a "reasonably informed and considered decision" that demonstrates an

"honest belief" in the proffered reason for the adverse employment action, the case should be dismissed." *Braithwaite*, 258 F.3d at 494.

### 1.

Suitor attempts to meet his burden of pretext by arguing that Charter's investigation and ultimate decision to terminate him was based entirely on inadmissible hearsay. *See* Pl. Resp. Mot. Summ. J. at 17 ("Each account providing that Plaintiff knowingly signed up customers by falsifying information is based upon inadmissible hearsay of five (5) customers."). Suitor argues that, when the hearsay is disregarded, the factual basis for Charter's conclusion that he violated ethical rules disappears. Because Suitor denied any wrongdoing during the initial meeting and during his deposition, Suitor argues that a question of fact exists.

If the decision to terminate Suitor was based only on unsupported personal beliefs by Charter employees, the company's employment decision would be suspect. *See Hartman*, 657 Fed. App'x at 452 ("Courts have accepted employment decisions based on other types of evidence, such as records, eyewitness accounts, and information provided by the employee, but they have rejected decisions based entirely on unsupported personal opinions."). However, as Charter argues, the customer statements on which Charter based its decision are admissible.

The Federal Rules of Evidence define hearsay as "a statement that: . . . a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). That definition makes clear that when an out-of-court statements is *not* offered to prove the truth of the matter asserted therein, it is not hearsay. The customer statements at issue here are relied upon by Charter "to demonstrate the state of mind and motive of Defendant's managers in discharging Plaintiff." *Haughton v. Orchid Automation*, 206 F. App'x 524, 532 (6th Cir. 2006). *See also Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598 (6th Cir. 2007) ("[W]itness statements

contained in an investigative report may be considered on summary judgment 'not to prove their truth, ... but to demonstrate the state of mind and motive of Defendant's managers in discharging Plaintiff.'") (quoting *Haughton*, 206 F. App'x at 532).

Suitor could potentially show pretext by demonstrating that the customer statements on which Charter relied were false. *See Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). But Suitor must do more than simply proffer a personal denial of the alleged misconduct. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992) ("Courts have repeatedly held that the plaintiff's denial of the defendant's articulated legitimate reason without producing substantiation for the denial is insufficient for a race discrimination claim to withstand a motion for summary judgment."); *Haughton*, 206 F. App'x at 532 (same). Suitor has not identified any evidence which substantiates his denial of misconduct. In fact, Suitor admitted both at the initial meeting and in his deposition that he sometimes did not check customer identification. If Suitor had checked customer identification every time, no errors regarding customer names could have occurred. Thus, Suitor admitted to one violation of Charter policies (failing to always check identification) and relies only upon his own denial of misconduct when charged with another (falsifying customer information when signing them up). Suitor has not met his burden of identifying some evidence which calls into question the factual basis for Charter's decision to terminate him. Accordingly, his retaliation claim is without merit.

**2.**

But, importantly, even if Suitor had identified evidence suggesting that the customer statements were false, he would still be required to demonstrate a genuine question as to whether Charter honestly believed the truthfulness of the customer statements. "When an employer reasonably and honestly relies on particularized facts in making an employment decision, it is

entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'" *Chen*, 580 F.3d at 401 (quoting *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 714–15 (6th Cir. 2007).

In his response brief, Suitor makes much of the fact that "Mr. Brackett admitted that he had no way of knowing whether the unidentified customers were telling the truth." Pl. Resp. Mot. Summ. J. at 20 (citing Brackett Dep. at 43). In his deposition, Suitor likewise contends that his purported ethical violations were ordinary occurrences among Charter sales representatives. The implication of these arguments is that Suitor's technical violations of Charter's ethical standards should be excused because those standards were not uniformly enforced. But both of these arguments miss the mark: "[T]he question is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the stated reason, but simply whether the stated reason was his reason: not a good reason, but the true reason." *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 418 (7th Cir. 2006).

Suitor has simply identified no evidence which suggests that Charter's investigation resulted in something less than a "reasonably informed and considered decision" to terminate his employment. *Braithwaite*, 258 F.3d at 494. The investigation was originally triggered by a customer who reported misconduct by Suitor. Charter management did not *sua sponte* initiate the investigation in order to find a reason to terminate Suitor. The audit of Suitor's sales revealed six sales where the order form contained incorrect information. Even after investigation revealed this pattern, Charter merely held a meeting, asked Suitor to provide an investigation, and suspended him pending further investigation. After that meeting, Suitor's supervisor contacted two customers identified in the original investigation. He questioned them regarding their encounter with Suitor. Both customers expressly testified that Suitor was aware they were existing Charter customers and

convinced them to allow him to sign them up for services under a false name. At this point, there was significant evidence of intentional wrongdoing which had been corroborated by several independent sources. It is true, as Suitor emphasizes, that the customers could have been lying. But Charter was not required to conduct an "optimal" investigation which "left no stone unturned." *Chrsyler*, 155 F.3d at 807. And, in the absence of any evidence supporting the theory that multiple customers independently decided to accuse Suitor of falsifying information, that speculative theory does not undermine Charter's assertion that it honestly believed the customers.

Additionally, Suitor admitted at his deposition that he committed two technical violations of Charter's ethical guidelines. On November 19, 2014, Suitor permitted another sales representative to complete a sales using his login information. Suitor Dep. at 52. Suitor argued that this practice was commonplace, but admitted that the violation occurred. Likewise, during the investigation into the potential falsification of customer information, Suitor admitted that he did not always check customer identification. Mr. Zybtowski testified that when an employee commits two ethical violations, the default remedy is termination. Zybtowksi Dep. at 25–26. Suitor does not contest that assertion. These admissions thus form an alternative basis for Charter's termination.

In summary, Suitor has not identified evidence which contradicts or undermines Charter's proffered factual basis for terminating him. Suitor has likewise presented no evidence which suggests that Charter did not honestly believe that Suitor was falsifying customer information. And, finally, Suitor's own testimony establishes that he committed two violations of Charter's procedures, which forms an independent basis for termination. Suitor's retaliation claim will be dismissed. Because the complaint will be dismissed, the pending motion in limine and objections to pretrial disclosures are moot. They will be denied and overruled accordingly.

**IV.**

Accordingly, it is **ORDERED** that Defendant Charter's motion for summary judgment, ECF No. 10, is **GRANTED.**

It is further **ORDERED** that Defendant Charter's motion in limine, ECF No. 17, is **DENIED as moot.**

It is further **ORDERED** that Defendant Charter's objections to pretrial disclosures, ECF No. 16, are **OVERRULED as moot.**

It is further **ORDERED** that the complaint, ECF No. 1, is **DISMISSED.**

Dated: May 2, 2018                                    s/Thomas L. Ludington
                                                      THOMAS L. LUDINGTON
                                                      United States District Judge

<div style="border:1px solid;">

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 2, 2018.

s/Kelly Winslow
KELLY WINSLOW, Case Manager

</div>